1    WO

6              IN THE UNITED STATES DISTRICT COURT

7                   FOR THE DISTRICT OF ARIZONA

9    Tamar Pina,                          No. CV 16-00354-TUC-BPV

10              Plaintiff,                 **ORDER**

11   v.

12   Nancy A. Berryhill, Acting Commissioner
     of Social Security,[1]

13

14              Defendant.

        Plaintiff Tamar Pina has filed the instant action pursuant to 42 U.S.C. § 405(g)
seeking review of the final decision of the Commissioner of Social Security.  (Doc. 1).
The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent.
(Doc. 23).  *See* 28 U.S.C. § 636(c).  Pending before the Court are Plaintiff's Opening
Brief (Doc. 15), Defendant's Brief (Doc. 19), and Plaintiff's Reply Brief (Doc. 20).  For
the following reasons, the Court remands this matter for further proceedings.

**I.    PROCEDURAL HISTORY**

        On September 6, 2012, Plaintiff protectively filed applications for disability
benefits and for supplemental security income, alleging disability as of August 2, 2012
due to "possible bipolar", dissociative disorder, anxiety, depression, mood swings,
headaches, and back aches.  (Transcript/Administrative Record ("Tr.") 24, 289; *see also*
Tr. at 250-63, 275 ("She also states to suffer from depression and anxiety which manifest

─────────────

        [1]  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A.
Berryhill is substituted as the named defendant in place of Carolyn W. Colvin.

in headaches, neck and back pain due to overly stressing self out."); Plaintiff's Brief at 3 (Plaintiff "alleges she is disabled from bipolar disorder, anxiety, headaches, and degenerative disc disease, which causes significant back pain and numbness in her upper extremities.")) . Plaintiff's date last insured for Title II benefits is December 31, 2012. (*See* Tr. at 24; Plaintiff's Brief at 2). Plaintiff's applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*See* Plaintiff's Brief at 2). On August 28, 2014, a hearing was held before ALJ George W. Reyes where Plaintiff, who was represented by counsel, and vocational expert ("VE") Jill Peterson testified. (Tr. at 44-89). On November 4, 2014, the ALJ issued his decision denying Plaintiff's application. (Tr. at 24-36). Thereafter, the Appeals Council denied Plaintiff's request for review (Tr. at 1-6), making the ALJ's decision the Commissioner's final decision for purposes of judicial review. Plaintiff then initiated the instant action.

## II. PLAINTIFF'S BACKGROUND

Plaintiff was born in 1979[2] and was 35 years of age on her alleged disability onset date. (Tr. at 84, 250); *see also* Tr. at 254, 274)). Plaintiff has obtained a GED. (Tr. at 48). Plaintiff also completed a vocational college certification program in medical billing and coding, where she earned straight A's, but did not obtain certification because she "failed the testing." (*Id.*). She did not attempt the test again because she felt "[d]iscouraged. I felt like I couldn't do it after failing the first time." (*Id.*).

Plaintiff's past work includes working on a production/assembly line and shipping and handling in a factory, customer service at call centers, and as a caregiver. (Tr. at 310; Plaintiff's Brief at 3; *see also* Tr. at 49 (the factory work involved wiping off the lids of pots and pans "and putting them into packages.")). Plaintiff quit working at the factory "because of just stress and all of the back pain." (Tr. at 49-50). With regard to work at

---

[2] Plaintiff's Opening Brief indicates that she was born in 1976 (Plaintiff's Brief at 3), but the record does not support this assertion. (*See* Tr. 250, 254, 274). The ALJ mistakenly states that Plaintiff was 33 years old on the date of his decision (Tr. at 34), but Plaintiff testified at the hearing that she was 35 years old. (Tr. at 84).

the call centers, Plaintiff "would make it through the training, because it's within a classroom, but then once I get out on the floor they're really on you about do this, do this, do this, and I'd be under so much stress and I'd have so much anxiety and so much stomach problems that I'd end up quitting." (Tr. at 68). Plaintiff's work as a caregiver to the elderly primarily involved taking them shopping or to doctors' appointments, and doing some cleaning, on days when she was having a good day. (Tr. at 50). Plaintiff stopped working as a caregiver when two of the people she was helping passed away, and "the last one I just—I was so depressed all the time that I kind of stopped helping her." (*Id.*). Plaintiff also worked for two days as a stocker at Target, but "couldn't do it . . . so much stress and from lifting and bending and moving . . . and then with anxiety causing a lot of the tension and I would get the headache. . . ." (Tr. at 69).

Plaintiff testified that she experiences panic attacks a few times a week, which cause her to "clam[] up, I get real panicky, the sweaty palms, I can't breathe, racing thoughts, heart palpitations." (Tr. at 59). Plaintiff also experiences mood swings where one day she might feel "normal like I can get through the day, and then I would go into like a hyperactivity mode for about two days, and then I would hit a low of depression and I would feel depressed for a couple of days. I wouldn't feel like showering, I wouldn't feel like eating and just no energy, no nothing, and I would cry a lot. And then I would end up coming back up to like another roller coaster road." (Tr. at 66). Plaintiff has experienced mood swings most of her life." (*Id.*; *see also* Tr. 67 (on "high energy" days Plaintiff becomes "so overwhelmed I don't know what to do with the energy, and I'll maybe start something and then I can't finish it[.]… And then I end up upset over it because I start a project I can't finish."); *see also* Tr. at 318 (describing mood swings)).

Plaintiff testified that she experiences "a lot of muscle spasms in [her] right shoulder which causes a lot of tension and headaches." (Tr. at 53). According to Plaintiff, "[a]nxiety causes headache, neck ache [and] shoulder pain." (Tr. at 318). She experiences anxiety "in all social settings." (*Id.*). The headaches involve pain radiating "from the top of [Plaintiff's] neck to the front of [her] head. Other times, [she] has right

temple throbbing that radiates to [her] right eye." (Tr. at 350). The headaches last "anywhere from a couple hours to a couple of days." (*Id.*). When Plaintiff is experiencing a headache, she must stop what she is doing and go to a cool, dark room to lie down and close her eyes. (Tr. at 351). In regard to pain, Plaintiff generally has 10 bad days per month, 15 moderate days, and 5 good days. (Tr. at 362). On bad days, "[e]very movement adds to the increase of headache to neck, back pain and especially stress[,]" and her "racing thoughts flare everything by adding to the tension and stress." (*Id.*). Even on moderate days, "too much thinking or movements add to the headaches and neck [and] back pain [sic] stress." (Tr. at 363). On good days, if she does too much, she "get[s] tension headaches around head, with neck, shoulder [and] back pain radiates and can't find relief." (*Id.*).

Plaintiff testified that she can walk one block, or five minutes, before needing to stop and rest for about one to two minutes. (Tr. at 53-54). She can stand for about 10 minutes at a time and she can sit for about 20 minutes. (Tr. at 54). Plaintiff is left-handed and can lift about 10 pounds with that arm. (*Id.*). She can lift and carry only five pounds with her right arm. (Tr. at 55). Plaintiff does not like to drive long distances because she "get[s] a lot of anxiety and fear and racing thoughts." (Tr. at 56). She usually only drives to the grocery store or Walmart. (*Id.*).

Plaintiff has two children, who were aged sixteen and eight on the date of the hearing, and she lives with her mother who was 71 years of age on the hearing date. (Tr. at 57, 58, 74). When Plaintiff was asked at the hearing why she lives with her mother, she responded that doing so makes her "feel at ease....[S]he kind of takes care of me.... She's my support system, and I just – I need her. I just – she helps me with the kids." (Tr. at 67). Plaintiff's mother helps with housework and cooking and reminds Plaintiff to take a shower and to eat when Plaintiff is depressed, which happens "[a] couple days a week." (*Id.*; Tr. at 77). Plaintiff's mother helps Plaintiff and Plaintiff also helps her mother by driving her to doctors' appointments and other errands and the two go shopping together about once a week. (Tr. at 58, 74, 77) . When the ALJ asked Plaintiff

about her statement in the record that she felt one of her strengths was taking care of her children and mother, Plaintiff responded: "That's what I mainly do. I feel like I take care of my mom as far as being there for her as a friend, a companionship, and when she needs somebody to take her to the doctor, because she won't drive." (Tr. 74). Plaintiff also testified that she did not help her mother bathe, get dressed, or change bedding. (Tr. at 76). Nor has Plaintiff had to lift her mother out of bed. (Tr. at 77). The two remind each other to take medication. (*Id.*).

## III.   THE ALJ'S DECISION

### A.   CLAIM EVALUATION

Whether a claimant is disabled is determined pursuant to a five-step sequential process. *See* 20 C.F.R. §§ 404.1520, 416.920. To establish disability, the claimant must show that: (1) she has not performed substantial gainful activity since the alleged disability onset date ("Step One"); (2) she has a severe impairment(s) ("Step Two"); and (3) her impairment(s) meets or equals the listed impairment(s) ("Step Three"). "If the claimant satisfies these three steps, then the claimant is disabled and entitled to benefits. If the claimant has a severe impairment that does not meet or equal the severity of one of the ailments listed…, the ALJ then proceeds to step four, which requires the ALJ to determine the claimant's residual functioning capacity (RFC)[3]….After developing the RFC, the ALJ must determine whether the claimant can perform past relevant work…. If not, then at step five, the government has the burden of showing that the claimant could perform other work existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience." *Dominguez,* 808 F.3d at 405.

### B.   The ALJ's Findings in Pertinent Part

The ALJ determined that Plaintiff "has the following severe impairments: affective disorder, anxiety disorder, headaches, and degenerative disc disease[.]" (Tr. 26). The ALJ found that Plaintiff had the RFC

---

[3] "The RFC is defined as 'the most' the claimant can do, despite any limitations." *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015), *as amended* (Feb. 5, 2016) (citation omitted).

to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant should never use ladders, ropes, or scaffolds. Mentally, she is limited to unskilled work that is not performed in a fast-paced production environment (the two examples used are the pace of work in a McDonald's restaurant at noontime or the pace of work in the famous *I Love Lucy* episode with the chocolates on the conveyor belt whizzing by Ethel and Lucy). Moreover, she is limited to only occasional interaction with coworkers/supervisors and further limited to only brief intermittent, superficial public contact. She is precluded from work in crowds (the example used is that of Costco employees who work in a crowd). The claimant can attend and concentrate in two hour blocks of time throughout an eight-hour workday with the two customary 10-15 minute breaks and the customary 30-60 minute lunch period.

(Tr. 29). Based upon the vocational expert's testimony at the hearing, the ALJ determined that Plaintiff was unable to perform her "past relevant work in production, assembly line; shipping and receiving; and caregiving." (Tr. at 29). The ALJ relied on the vocational expert's testimony to further determine that Plaintiff would be able to perform other work such as: mail sorter or housekeeper. (Tr. at 35). Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act from August 2, 2012 through the date of the ALJ's decision. (Tr. at 36).

## IV. DISCUSSION

Plaintiff argues that the ALJ erred by: (1) failing to consider substantial evidence of hand pain and weakness; (2) failing to give appropriate weight to the opinion of Plaintiff's treating physician, Dr. Thili Kulatilake; (3) failing to consider all of Plaintiff's impairments in posing hypothetical questions to the VE; (4) improperly imposing his own medical opinion; and (5) failing to fully consider Plaintiff's statements and testimony about the limiting effects of her impairments. A fair reading of Plaintiff's argument supports the conclusion that she does not contest the ALJ's analysis of the medical evidence regarding her mental impairments and she did not object when Defendant made this assertion. (*See* Defendant's Brief at 7; Plaintiff's Reply) According to Defendant the ALJ's opinion should be affirmed because it is free from error and based upon substantial evidence. Defendant also argues that even if the ALJ's decision was

erroneous, any such error was harmless.

## A.    STANDARD

The court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). The "court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart,* 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Matney,* 981 F.2d at 1019. However, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett,* 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Id.; Garrison v. Colvin,* 759 F.3d 995, 1009 (9th Cir. 2014). The court shall "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a

ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

## B. HAND PAIN AND WEAKNESS

Plaintiff argues that the ALJ "failed to address her tingling, numbness, and radiating pain into her arms and hands." (Plaintiff's Brief at 13). She contends that this failure resulted in error at Step Two because the ALJ did not identify hand pain and weakness as a severe impairment, and that the error was compounded "during the crafting of the RFC statement." (Reply at 4-5).

The ALJ acknowledged Plaintiff's testimony "that for the past fifteen years, she has not been able to lift/carry more than 10 pounds with her dominant left arm, without hurting herself. She also claimed that for the past fifteen years, she could not lift more than five pounds with her left[4] arm." (Tr. at 30). The ALJ did not include specific discussion of whether Plaintiff was impaired with regard to her arms and hands when he determined Plaintiff's severe impairments, although he did identify degenerative disc disease as a severe impairment. The ALJ ultimately determined that Plaintiff could perform a limited range of light work, which involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). He assessed no limitations on Plaintiff's ability to handle, grasp or use her fingers.

Step Two "is 'a de minimis screening device [used] to dispose of groundless claims.'" *Webb v. Barnhart,* 433 F.3d 683, (9th Cir. 2009) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (1996)). Under Step Two, "the applicable regulations state that '[a]n impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities.'" *Edlund v. Massanari,* 253 F.3d 1152, 1159 (9th Cir. 2001) (quoting 20 C.F.R. § 404.1521(a)). Basic work activities are defined as including such capabilities as lifting, carrying or handling.

---

[4] Plaintiff actually testified that she could lift and carry five pounds with her *right* arm. (Tr. at 55).

20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1) (effective until March 27, 2017).[5] In the Ninth Circuit, "[a]n impairment or combination of impairments may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb*, 433 F.3d at 686 (internal quotation marks, citation, and emphasis omitted). Plaintiff bears the burden of establishing that her impairments are "severe" under Step Two. *Edlund,* 253 F.3d at 1159-60.

Moreover, Step Two "is not meant to identify the impairments that should be taken into account when determining the RFC. In fact, '[i]n assessing RFC, the adjudicator must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Buck v. Berryhill,* __ F.3d __, 2017 WL 3862450, *5 (9th Cir. Sept. 5, 2017) (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996)). Thus, "[t]he RFC … should be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Id.*; *see also Carmickle v. Comm'r of Soc. Sec. Admin,* 533 F.3d 1155, 1165 (9th Cir. 2008) ("Even though a non-severe "impairment[ ] standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").

In January 2013, neurologist Xavier Martinez, M.D., examined Plaintiff upon referral by Plaintiff's treating doctor, Thili Kulatilake, M.D., for complaints of
> chronic neck pain with symptoms referred into the right shoulder and down the right arm. She also has generalized headaches, and 2-½ weeks ago, she was seen at [the hospital] because of worsening neck pain and headaches. She was treated conservatively with Flexeril, Vicodin and Motrin. She complains of pinpoint pain in the cervical neck region and has spasms, and symptoms are now going down the right arm and into the hand. She also has tenderness in the left elbow and triceps muscle. No trauma.

---

[5] Social Security Regulations regarding medical evidence rules were amended effective March 27, 2017. *See* Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 19, 2017). "Where, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision." *Rose v. Berryhill,* 2017 WL 2562103, at *2 (C.D. Cal. June 13, 2017) (citations omitted). Accordingly, citations to the regulations throughout this Order are to the version in effect from November 4, 2014 to March 26, 2017.

(Tr. at 449).  On neurological examination, Plaintiff demonstrated

> C3-C4 paraspinal muscle spasm of a moderate degree.  Full should shrug with mild weakness of the right arm at all muscle groups which could be related to pain/effort or a pinched nerve.  Left arm and both lower extremities motor power is full....Negative Tinel's at elbows and wrists.  Normal muscle bulk and tone....Sensory is diminished on the right arm and the right forearm.

(Tr. 449-50).  Dr. Martinez's assessment was

> Acute superimposed on chronic cervical neck pain with symptoms referred down the right arm, rule out central cervical spinal stenosis and/or associated radiculopathies.  She has paracervical muscle spasm and muscle contraction headaches related to same.  She was seen at [the hospital] 2-½ weeks ago.

(Tr. at 450).  His plan included an MRI of the cervical spine and electrical testing of the right arm.  (*Id.*).

A January 29, 2013 MRI of Plaintiff's cervical spine showed disc desiccation at C2-C3, C3-C4, C4-C5 (with endplate degenerative changes noted and "a 1-mm midline disc protrusion"), and C5-C6 (with endplate degenerative changes noted and "a 3-mm left preforaminal and left foraminal disc protrusion with abutment of the exiting left cervical nerve root").  (Tr. at 453).  Dr. Martinez interpreted the MRI as reflecting: "some mild multilevel DJD with very tiny disk protrusions…on the left….Her symptomatic side is the right side."  (Tr. at 452).

> February 2013 electrodiagnostic testing with emphasis on the right
> was essentially within the limits of normal.  Specifically, there was no evidence of a cervical radiculopathy or plexopathy.  EMG needle did show some right-sided paracervical muscle spasm related to tension but no nerve impingement from the neck.  The right median nerve testing was borderline/normal which means that it may be causing some of the numbness on the right hand/arm, but on today's test [Dr. Martinez] read it as normal.

(Tr. at 451; *see also* Tr. at 866).

Dr. Martinez opined that Plaintiff's "neck pain is musculoskeletal related to tension or spasms."  (Tr. at 452).  He recommended daily flexion, extension and stretching-type exercises to relieve the neck spasms and he stated that he "would not be

surprised if she developed some mild right carpal tunnel down the road which can be treated conservatively with splinting." (*Id.*).

Plaintiff saw Dr. Martinez again in May 2014 for complaints of muscle spasms and neck pain upon her feeling "tensed and angry and irritated[.]" (Tr. at 866). On exam, she had a "moderate amount of paracervical muscle spasm." (*Id.*). Dr. Martinez opined that Plaintiff's headaches were "directly related to her psyche issue[]," and he prescribed topiramate. (Tr. at 867).

In the summer of 2014, Plaintiff was found to have a ganglion cyst on her left wrist which caused dysesthesias in her ring and little fingers with radiation up to her elbow. (Tr. at 1035; *see also* Tr. 1036). Examination also "revealed a positive Tinel's sign, which is a diagnostic technique for finding nerve irritation whereby nerves are percussed to elicit tingling in the distribution of the nerve." (Plaintiff's Reply at 4 (citing Tr. 1035; http://www.medicinenet.com/script/main/art.asp?articlekey=16687)). Plaintiff also exhibited 56 pounds of grip in her right hand and 70 pounds on the left.[6] (Tr. at 1036). Physical examinations in August and September 2013 reflected full range of motion in the neck and back, and tenderness of the paracervical muscles. (Tr. at 597, 904).

As Defendant points out, an impairment must be established by objective medical evidence consisting of signs, symptoms and laboratory findings, and also must result from anatomical, physiological, or psychological abnormalities that "can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms[.]" 20 C.F.R. §§ 404.1508, 416.908 (effective until March 27, 2017). (*See also* Defendant's Brief at 11).

Where the ALJ makes a Step Two non-severity finding, the question on review is

---

[6] Plaintiff asserts in the briefing that she was found to have "only 56 pounds [of grip strength] in her dominant right hand. The dominant hand should have a greater grip strength." (Plaintiff's Reply at 4 (citations omitted)). Plaintiff's statements in the record reflect that she is left-handed. (*See* Tr. at 54, 323).

"whether the ALJ had substantial evidence to find that the medical evidence clearly established that [Plaintiff] did not have a medically severe impairment or combination of impairments." *Webb,* 433 F.3d. at 687. The substantial evidence of record with regard to hand pain and weakness consists of mild degenerative changes of the cervical spine without significant nerve root compression, sensory deficit on the right arm and forearm, borderline/normal results on electrodiagnostic testing, evidence of reduced grip strength in Plaintiff's right hand which Plaintiff concedes is expected in a non-dominant hand, and positive Tinel's sign on the left. Additionally, Dr. Martinez opined that muscle spasms and tension caused Plaintiff's symptoms. Based on the objective medical evidence of record, the ALJ's decision to omit hand pain and weakness as a severe impairment at Step Two was not erroneous.

What is problematic is the ALJ's RFC determination. This is so because an ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe." *Buck,* __ F.3d. at __, 2017 WL 3862450 at *5 (internal quotation marks and citation omitted). Further, when determining a claimant's RFC, the "ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006) (*quoting* SSR 96-8P). "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8P, 1996 WL 374184, *7.

The parties dispute whether Plaintiff's hand and arm weakness constitutes a medically determinable impairment ("MDI"). However, even if there is no MDI specifically termed hand or arm pain and weakness, the ALJ must still consider symptom testimony in arriving at the RFC assessment. Dr. Kulatilake opined that Plaintiffs symptoms are primarily attributable to degenerative disc disease of the cervical spine (*see* TR. 459-65), and Dr. Martinez has indicated that Plaintiff's pain was musculoskeletal

related to tension, spasms[7], and her "psyche issues", (Tr. at 452, 867). The ALJ determined that Plaintiff suffered from severe impairments of affective disorder, anxiety disorder, headaches, and degenerative disc disease. (Tr. at 26). Her hand pain and weakness, even if not an MDI in and of itself, certainly could be symptoms caused by the severe MDIs, singly or in combination, the ALJ did find, and Drs. Kulatilake and Martinez said as much. Yet, the ALL did not discuss hand pain and weakness in assessing Plaintiff's RFC.

As Plaintiff points out, the ALJ's error was not harmless because further restriction of Plaintiff's ability to lift and or carry or use her hands could erode the occupational base and, thus, must be considered in arriving at the RFC and determining Plaintiff's ability to perform other work.

## C.   TREATING DOCTOR'S OPINION

Treating Dr. Kulatilake provided a statement of Plaintiff's RFC, indicating in pertinent part that she can: occasionally lift and/or carry 10-20 pounds; frequently lift and/or carry less than 10 pounds; occasionally bend or stoop; and stand or walk 2-3 hours in an 8-hour workday. (TR. 464; *see also* Plaintiff's Brief at 14 (Dr. Kulatilake's assessment "describes a modified sedentary RFC."); Defendant's Brief at 7 ("Dr. Kulatilake opined Plaintiff retained a sedentary residual functional capacity with postural, environmental, and mental limitations with medication side effects.")). Dr. Kulatilake stated that Plaintiff suffered from "mild multilevel degenerative disc disease with [illegible] disc protrusions less than 3 mm at C5-C6 on the left and less than 1 mm at C4-C5 to the left." (Tr. at 459; *see also* Tr. at 460 ("C-spine MRI shows minor disc protrusions without significant nerveroot compression"). He also stated that Plaintiff had

_____

[7] Symptoms such as pain or weakness will not be found to affect a claimant's ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment is present. 20 C.F.R. §§404.1529(b), 416.929(b). In assessing the intensity and persistence of a claimant's symptom testimony, the ALJ will consider, among other things, objective medical evidence, which "is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, *muscle spasm, sensory deficit or motor disruption*." 20 C.F.R. §§404.1529(c)(2);416.929(c)(2) (emphasis added).

17 degree convex, right upper lumbar curvature.  (Tr. at 463; *see also* Tr. at 433 (2002 radiology report reflecting that Plaintiff had rotoscoliosis at approximately 15 degrees in the lumbar spine)).  He stated that Plaintiff is limited by neck pain, headaches, right shoulder pain and right upper back pain, and the medication she takes to treat bipolar disorder made her drowsy.  (Tr. 459).  Although Plaintiff could perform flexion and rotation of the cervical spine, she did so with "significant discomfort", with the right greater than the left.  (TR. at 460).  Dr. Kulatilake also wrote that "at times [patient] has tingling . . . ."[8]  (*Id.*).  He further noted that Plaintiff's ability to stand and walk is limited by pain in her neck, shoulders and back, as well as headaches.  (Tr. at 464).  Plaintiff points out that, Dr. Kulatilake's opinion is the only statement of her residual functioning capacity on record and, as such, it is an uncontradicted opinion.  (Plaintiff's Reply at 2).

The ALJ rejected Dr. Kulatilake's assessment because it:  (1) "appear[ed] to be too restrictive based on the other evidence of record[]"; and (2) Dr. Kulatilake "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.  Yet as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints."  (Tr. 34).[9]

Medical opinions and conclusions of treating doctors are accorded special weight because treating doctors are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to substantial weight.") (internal quotation marks and

---

[8] The rest of Dr. Kulatilake's handwritten statement, which is somewhat illegible, appears to read "but no numbness" (Tr. at 460); however, Plaintiff contends that the note indicates "numbness" in her hands. (Plaintiff's Brief at 14).

[9] The ALJ also "noted that while being more restrictive in nature, the doctor's opinion fails to find the claimant incapable of performing all work." (Tr. 34). Defendant does not contend that this statement constituted "a legally sufficient reason[] to reject Dr. Kulatilake's opinion." (Defendant's Brief at 7-8).

citation omitted); *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir. 1987); 20 C.F.R. §§ 404.1527, 416.927.

A treating physician's medical opinion "is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical laboratory diagnostic techniques and is not inconsistent with the other substantial evidence [in the claimant's] case record.'" *Trevizo v. Berryhill,* __F.3d __, 2017 WL 4053751, at *7 (9th Cir. Sept. 14, 2017) (quoting 20 C.F.R. §404.1527(c)(2)); *see also Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007) (same)); 20 C.F.R. § 416.927(c)(2). When the treating doctor's opinion is not given controlling weight, "it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Trevizo,* __ F.3d. at __, 2017 WL 4053751, at *7 (citing 20 C.F.R. at 404.1527(c)(2)-(6); *see also* 20 C.F.R. § 416.927(c)(2)); *see also* SSR 96-2P, 1996 WL 374188, *4[10] ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."). Thus, even if the treating physician's opinion does not meet the test for controlling weight, the treating physician's opinion may still be entitled to the greatest weight and should be adopted. *Orn*, 495 F.3d at 631. Importantly, the ALJ's failure to consider the factors for weighting the opinion "alone constitutes reversible error." *Trevizo,* __ F.3d. at __, 2017 WL 4053751, at *7.

---

[10] In light of new rules effective March 27, 2017, the Commissioner rescinded SSR 96-2P. *See* Notice regarding Rescission of Social Security Rulings 96-2P, 96-5P, AND 06-3P, 2017 WL 3928298 (March 27, 2017). However, the ruling applied at the time the ALJ rendered his decision and discusses the regulations governing claims, like Plaintiff's, that were filed before March 27, 2017.

Defendant does not dispute Plaintiff's assertion that there is no other medical source assessment of Plaintiff's physical RFC in the record, (*see* Plaintiff's Brief at 4; *see generally* Defendant's Brief), which makes Dr. Kulatilake's opinion uncontradicted. (*See* Reply at 2). It is well-settled that an ALJ may reject a treating doctor's uncontradicted opinion only after giving "'clear and convincing' reasons supported by substantial evidence in the record."[11] *Reddick,* 157 F.3d at 725 (*quoting Lester,* 81 F.3d at 830). In considering whether an ALJ has properly rejected a doctor's opinion, the court must rely only on the ALJ's stated bases for rejecting the claimant's disability claims. *Trevizo,* __ F.3d. at __ n. 4, 2017 WL 4053751 at *8 n.4 ("Because the ALJ did not provide these explanations herself as a reason to reject [the treating doctor's opinion], the district court erred in looking to the remainder of the record to support the ALJ's decision, and we cannot affirm on those grounds.").

The ALJ did not specifically state what weight he accorded Dr. Kulatilake's opinion. However, Defendant concedes that the ALJ "reject[ed]" the Doctor's opinion, which is also apparent from the ALJ's RFC assessment. (Defendant's Brief at 7-8). The ALJ's rejection of Dr. Kulatilake's opinion was legally erroneous because he failed to consider the appropriate factors for weighting the opinion. *See e.g., Trevizo,* __ F.3d at __, 2017 WL 4053751, at *7 (holding same in analogous situation). Although the ALJ indicated that Dr. Kulatilake's opinion "appears to be too restrictive based on other evidence of record", (Tr. at 34), the ALJ did not consider other factors such as the length

---

[11] To any extent Defendant questions whether the "clear and convincing reasons" standard applies to rejection of an uncontradicted doctor's opinion (*see* Defendant's Brief at 2 n.16), the law in the Ninth Circuit is clear that the ALJ is required to provide "clear and convincing reasons" to reject a doctor's uncontradicted opinion. *See Popa v. Berryhill,* __ F.3d. __, 2017 WL 4160041, at *4 (9th Cir. Sept. 20, 2017); *Trevizo,* __ F.3d at __, 2017 WL 4053751, at *7 (citing *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2009)); *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998); *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005); *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995). Even if the Court were inclined to revisit the issue, which it is not, the Court is in no position to overturn Ninth Circuit law.

of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion. *Id.*

Moreover, the ALJ did not provide "'clear and convincing reasons that are supported by substantial evidence'", which he is required to provide before disregarding a treating physician's uncontradicted opinion. *Id.* (quoting *Ryan* 528 F.3d at 1198). As to the ALJ's stated reasons for rejecting Dr. Kulatilake's opinion, Defendant asserts that based upon substantial evidence in the medical records, "the ALJ reasonably found that Dr. Kulatilake's opinion was too restrictive." (Defendant's Brief at 9). Plaintiff argues that Dr. Kulatilake's opinion "detailed objective evidence of degenerative disc disease and the doctor's own observations of pain. Specifically, Dr. Kulatilake notes that Ms. Pina's limitations stem primarily from multiple musculoskeletal issues, including scoliosis, degenerative disc disease, dis[c] protrusions with abutment of exiting nerve roots, and headaches. He also specially notes that Ms. Pina's bipolar medication, Seroquel, causes considerable drowsiness, which must also be considered." (Plaintiff's Brief at 14-15 (citations omitted)).

Plaintiff also argues that instead of citing clear and convincing reasons to reject Dr. Kulatilake's opinion based on the objective evidence of Plaintiff's impairments, the ALJ instead impermissibly imposed his own medical opinion. According to Plaintiff, "[t]he ALJ did not precisely state a reason why the objective medical evidence of impairments was discounted, but it may be inferred that he did not feel that mild degenerative changes could possibly result in as much pain as Ms. Pina reports experiencing. There is no medical testimony or evidence to support this position." (Plaintiff's Brief at 18-19). The Court agrees. Although the ALJ emphasized when discussing the medical evidence that Plaintiff's test results indicated "*mild* degenerative changes", "some mild multilevel degenerative joint disease", "minor disc protrusions without significant nerve root compression", and "*normal*" right hand/arm EKG (*see* Tr., 30) (emphasis in original), Plaintiff's treating doctor nonetheless concluded based on these tests and his treatment of Plaintiff, that she was limited to a modified sedentary

functional capacity. The ALJ's discussion overlooks that "[t]he subjective judgments of treating physicians are important, and properly play a part in their medical evaluations." *See e.g., Embrey,* 849 F.2d at 422. The ALJ, instead, without assessment or opinion from any other medical source, decided that Dr. Kulatilake's assessment was too restrictive and that Plaintiff could work at a modified light functional capacity.[12] "As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms. . . ." *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999) (citations omitted); *see also Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, … and he must not succumb to the temptation to play doctor and make his own independent medical findings.") (internal quotation marks and citation omitted); *cf. Stairs v. Astrue*, 2011 WL 318330, at *12 (E.D. Cal. Feb. 1, 2011) ("When an ALJ rejects all medical opinions in favor of his own, a finding that the RFC is supported by substantial evidence is less likely.").

The ALJ also rejected Dr. Kulatilake's opinion because it appeared to the ALJ that the doctor relied too heavily on Plaintiff's subjective complaints, which the ALJ found to be not fully credible. "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti,* 533 F.3d at 1041 (quoting *Morgan v. Comm'r Soc. Sec. Admin,* 169 F.3d 595, 601 (9th Cir. 1999)). Here, the ALJ discounted Plaintiff's statements about her physical limitations due to pain and hand/arm numbness. In doing so, he first stated that Plaintiff did not exhibit "common side effects of prolonged and/or chronic pervasive pain" such as weight loss and diffuse muscle atrophy or muscle-wasting. (Tr. at 31 (citing examinations showing full motor power, normal muscle bulk/tone, and "no atrophy")). Neither the ALJ nor Defendant cite any statement by any medical provider of

---

[12] There is no medical evidence to support the ALJ's finding that Plaintiff could work at a modified light capacity. *See e.g., Tackett,* 180 F.3d. at 1103 (ALJ's finding that plaintiff could work through an eight-hour workday was not supported by substantial evidence where there was no medical evidence to support it and ALJ's characterization of the plaintiff's activities was not supported by the record).

record indicating that diffuse muscle atrophy, weight loss, or the other side effects mentioned by the ALJ would necessarily accompany Plaintiff's impairments. The Ninth Circuit has affirmed the denial of benefits where, *inter alia*, the plaintiff alleged she had to maintain a fetal position all day because of constant pain, but she exhibited no physical signs including muscle atrophy of a totally incapacitated person. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999). Plaintiff's case is distinguishable from *Meanel*. Plaintiff does not claim to be totally incapacitated. As the ALJ acknowledges, Plaintiff moves about her seeing to her personal needs, driving her mother to appointments, and helping her children. (*See* Tr. at 31). Arguably, these activities forestalled diffuse muscle atrophy and/or muscle wasting. There is simply no basis on this record to disbelieve Plaintiff or to reject Dr. Kulatilake's opinion because Plaintiff did not exhibit the side effects described by the ALJ. *See e.g., Hardt v. Astrue*, 2008 WL 349003, at *3 (D. Ariz. Feb. 6, 2008) (finding no basis to disbelieve plaintiff who did not experience diffuse atrophy or muscle wasting where "[t]he record established (and the ALJ found) that [she] is able to perform some daily activities [and]...participated in treatments and a home stretching program.").

With regard to Plaintiff's ability to lift and/or carry, the ALJ mentions Plaintiff's testimony that in 2002 "i.e., twelve years ago—she worked in a production job that required her at times to lift/carry up to twenty pounds. Work history reports, completed by the claimant, indicated lifting up to twenty pounds in 2010 and 2011." (Tr. at 31). However, Plaintiff's testimony about the production job also included that she "quit the job because of just stress and all of the back pain." (Tr. at 49-50). The work reports cited by the ALJ reflect that in 2010 and 2011, Plaintiff performed work based on a barter system where she would "take people shopping, helping my mother get to dr.[,] make appts., pay bills, all in exchange for bartered services. Paying my phone bill, car insurance, rent, necessities." (Tr. at 311; *see also* Tr. at 310, 312). Plaintiff indicated that the "heaviest" weight lifted was 20 pounds and that she "frequently" lifted less than 10 pounds. (Tr. at 311, 312). There is no indication how often Plaintiff was required to

lift items weighing up to 20 pounds while doing this work. Plaintiff also testified that she did this work on her "good days." (Tr. at 50).

The Seventh Circuit Court of Appeals has observed that "the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation."[13] *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir.2003). Plaintiff's past work does not in and of itself support the ALJ's conclusion regarding her capacity to lift. Finally, Plaintiff testified that she could only lift about 10 pounds with her left arm and five with her right. Dr. Kulatilake's opinion that Plaintiff could occasionally lift up to 20 pounds is less restrictive than Plaintiff's subjective assessment and, thus, cuts against the ALJ's supposition that the doctor "uncritically" accepted Plaintiff's subjective complaints. Likewise, Dr. Kulatilake's assessment as to how much walking and standing Plaintiff could do was also less restrictive than what Plaintiff testified to be able to do.

The ALJ also pointed out that despite Plaintiff's testimony, her function reports completed in 2012 make no mention of physical limitations, including lifting, sitting or walking. (Tr. at 31 (citing Tr. at 307, 323)). Instead, Plaintiff indicated difficulty with functions such as talking, memory, completing tasks, concentration, understanding, talking, and following instructions. (Tr. 307, 323). A fair reading of Plaintiff's function reports reflects that her focus was on her mental impairments. (*See* Tr. at 302 (when describing how her conditions limit her ability to work, Plaintiff identified mood swings

---

[13] Elsewhere, the ALJ pointed out that Plaintiff appeared to engage in work activity after the alleged onset date. (Tr. 32 ("The claimant testified that she has looked for simple various jobs that she would find on Craig's List [Tr. at 48], in May 2012 [Tr. at 400] she indicated she was starting a new job, and in April 2013 [Tr. at 783], she indicated she was 'helping Jim and earning some money.'")). Although the ALJ doubted that such work qualified as substantial gainful activity, he found "it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported." (*Id.*). The rationale in *Henderson,* cited *supra,* applies here as well. Further, the ALJ did not develop the record as to the type and extent of work involved. Absent specific details about Plaintiff's work activities, these activities cannot constitute substantial evidence to undermine Dr. Kulatilake's informed opinion. *See e.g. Trevizo,* __ F.3d __, 2017 WL 4053751, at *8 (ALJ's reliance of claimant's activities to reject treating doctor's opinion was erroneous where ALJ failed to obtain specific details those activities).

causing "mixed emotions about my confidence", self-doubting, anxiety, racing thoughts and "feeling like there are two brains trying to take charge and decide what I should do constantly thinking in two different ways…."); Tr. at 318 (when answering the same question, Plaintiff stated: "Anxiety causes headache, neck [and] shoulder pain. Get anxiety in all social settings. Moodswings cause highs [and] lows, which leave me depressed and loose [sic] interest in things, or I quit my job cause I fail, or become depressed and don't want to get fired.")). In any event, although Plaintiff may not have considered herself as physically "limited" with regard to work when filling out the form, when she was asked direct questions about her ability to lift, stand, sit, and walk, her responses reflected that she was. Nor did the ALJ inquire as to why Plaintiff omitted such limitations from the function report. The record also reflects that Plaintiff sought treatment for complaints of pain, including chronic neck pain radiating down her right arm. Considering the substantial evidence of record as a whole, the information Plaintiff included on her function reports is not a convincing reason to reject Dr. Kulatilake's findings.

The ALJ also mentioned that Plaintiff cared for her children and her mother (Tr. at 31), which included driving her mother on errands and to appointments, taking the children back and forth to school, helping with homework, getting them ready for bed, and preparing simple meals, (Tr. at 304, 319; *see also* Tr. 422 (Plaintiff reported cleaning the house)), none of which is necessarily inconsistent with Plaintiff's testimony about her physical limitations. Plaintiff also testified that her mother helped care for the children. (Tr. at 57-58). Plaintiff's testimony or other statements about these activities cited by the ALJ do not undermine Dr. Kulatilake's opinion as to Plaintiff's limitations. *Cf. Trevizo,* __F.3d at __, 2017 WL 4053751, at *8 (ALJ erroneously relied on the claimant's daily activities to reject treating doctor's opinion).

On the instant record, the ALJ has failed to state sufficient reasons to reject Dr. Kulatilake's opinion. Nor is there any basis whatsoever as to how the ALJ arrived at the physical RFC assessment that he applied in his decision.

### D.  PLAINTIFF'S CREDIBILITY

Plaintiff takes issue with the ALJ's finding that her "testimony with regard to the severity and functional consequences of her symptoms [was] not fully credible. (SSR 96-7p))." (Tr. 33).  The crux of Plaintiff's argument is that "[t]he ALJ pinpointed minor inconsistencies between Ms. Pina's testimony and written statements and the [medical records], and found her statements about the severity of her injuries less credible for that reason." (Plaintiff's Brief at 21).  According to Plaintiff, many of the factors the ALJ considered, such as inconsistent statements about when Plaintiff quit smoking or whether she had friends did not relate to her testimony about her physical symptoms.  (*Id.*; *see also* Reply at 5).  Plaintiff argues that "[h]ighligting inconsistencies in that testimony is a character-based argument not a symptomatic one." (Reply at 5).  Plaintiff also points out that a new Social Security Ruling, SSR 16-3P, has replaced the one cited by the ALJ.

Defendant contends that when assessing credibility, the ALJ may engage in ordinary techniques of credibility evaluation such as inconsistencies in a claimant's testimony and, thus, the ALJ's credibility assessment was proper  (Defendant's Brief at 16 (citations omitted)).  Defendant also argues that the ALJ stated additional sufficient reasons for concluding that Plaintiff's other testimony about her symptoms was not credible.

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn*, 495 F.3d at 635 (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to some degree of the symptoms, and there is no affirmative finding of malingering, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing, which "'is the most demanding [standard] required in Social Security cases.'" *Garrison,* 759 F.3d at 1014 (quoting *Moore v. Comm'r of Soc. Sec. Admin.,* 278 F.3d 920, 924 (9th Cir. 2002)); *see also Burrell v. Colvin,* 775 F.3d 1133, 1137 (9th Cir. 2014) (reaffirming that the "clear and convincing reasons" standard

applies in such cases). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284; *see also Orn*, 495 F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive).

At the time of the ALJ's decision, SSR 96-7P addressed "assessing the credibility of an individual's statements[.]" SSR 96-7P, 1997 WL 374186. "In March 2016, that ruling was superseded to 'eliminat[e] the use of the term "credibility" from our sub-regulatory policy, as our regulations do not use this term' and to 'clarify that subjective symptom evaluation is not an examination of an individual's character' but instead was meant to be consistent with 'our regulatory language regarding symptom evaluation.'" *Trevizo*, __ F.3d at __ n. 5, 2017 WL 4053751, at *9 n.5 (quoting SSR 16-3P, 2016 WL 1110029, at *1). The Ninth Circuit has stated that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." *Id.*

The analysis with regard to the ALJ's rejection of Dr. Kulatilake's opinion support the conclusion that at least some of the reasons proffered by the ALJ to question Plaintiff's credibility are invalid. As Plaintiff also points out, it is not clear how Plaintiff's testimony about when she quit smoking factors into assessment of Plaintiff's symptom testimony. As discussed below, remand for further proceedings is necessary in light of the ALJ's improper rejection of Dr. Kulatilake's opinion. On remand, the ALJ should also reconsider Plaintiff's credibility with regard to the alleged intensity and persistence of her symptoms.

## V.   REMAND FOR FURTHER PROCEEDINGS

Plaintiff asserts that "[p]roper consideration of the evidence could result in a favorable determination, but at the very least it triggers the need for further development

and reversal and remand for further proceedings is required." (Plaintiff's Brief at 22).

"A district court may 'revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing,' *Treichler v. Comm'r of Soc.[] Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation,' *id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))." *Dominguez,* 808 F.3d at 407. Remand for an award of benefits is appropriate only where the following three prerequisites are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.[14]

*Garrison,* 759 F.3d at 1020 (footnote and citations omitted). The Ninth Circuit has been clear that it is an abuse of discretion to remand "for an award of benefits when not all factual issues have been resolved." *Treichler,* 775 F.3d at 1101, n.5 (citation omitted); *see also Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) ("The touchstone for an award of benefits is the existence of a disability, not the agency's legal error. To condition an award of benefits only on the existence of legal error by the ALJ would in many cases make disability benefits [] available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).") (internal quotation marks and citations omitted).

Although the ALJ failed to properly consider Plaintiff's hand/arm pain and weakness when determining Plaintiff's RFC, there is no indication on the instant record as to how any such limitation would affect the RFC assessment. Further, in light of the ALJ's improper rejection of Dr. Kulatilake's assessment, the limitations assessed by the

---

14 The Ninth Circuit has noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Garrison,* 759 F.3d at 1020 n. 26 (citing *Smolen,* 80 F.3d at 1292).

ALJ with regard to Plaintiff's mental impairments (which are not at issue here) and the physical limitations assessed by Dr. Kulatilake, together with any other limitations regarding Plaintiff's hand/arm pain, will require reconsideration of the RFC analysis and the Step Five determination. Plaintiff also persuasively asserts that, at this point, the VE testimony of record "is without evidentiary value." (Plaintiff's Brief at 17). "If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." *Matthews v. Shalala,* 10 F.3d 678, 681 (9th Cir. 1993) (internal quotation marks and citation omitted)). Consequently, further development of the record is necessary, which may include testimony from a vocational expert.

## VI.   CONCLUSION

For the foregoing reasons, the Court remands this matter for further proceedings consistent with this Order. Accordingly,

IT IS ORDERED that:

(1)  the Commissioner's decision denying benefits is REVERSED; and

(2)  this matter is REMANDED to the Commissioner for further proceedings consistent with this Order.

The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its file in this matter.

Dated this 21st day of September, 2017.

_____
Bernardo P. Velasco
United States Magistrate Judge